UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| DON LEE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>vs.<br><br>ACTIVE POWER, INC., STEVEN R. FIFE, and DOUG MILNER,<br><br>Defendants. | Civil Action No.:  1:13-cv-00797<br><br><br>**JURY TRIAL DEMANDED** |

## ORIGINAL CLASS ACTION COMPLAINT

Plaintiff Don Lee ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which includes without limitation: (a) review and analysis of regulatory filings made by Active Power Inc. ("Active Power" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Active Power; and (c) review of other publicly available information concerning Active Power.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased the common stock between April 30, 2013 and September 5,

1

2013, both dates inclusive, (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C.§§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). The Company's headquarters are located in this district.

5. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

6. Plaintiff Don Lee, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Active Power common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

7. Defendant Active Power, headquartered in Austin Texas, together with its subsidiaries, designs, manufactures, and services uninterruptible power supply (UPS) products and

modular infrastructure solution (MIS) products that provide electrical power continuity and integrated infrastructure platforms for data centers and other mission critical applications.

8. Defendant Doug Milner was ACPW's CEO between March 1, 2012, and July 29, 2013, when he resigned all positions with ACPW.

9. Defendant Steven R. Fife ("Fife") was ACPW's CFO beginning October 9, 2012, until the end of the Class Period.

## DEFENDANTS' MISCONDUCT

10. ACPW designs, manufactures and services uninterruptible power supply ("UPS") products and modular infrastructure solution ("MIS") products that provide electrical power continuity and integrated infrastructure platforms for data centers and other mission critical applications. ACPW's customers use its products to permit continuous operations until power is restored.

11. In 2012, UPS sales accounted for 57% of ACPW's revenues.

12. ACPW sells UPS products either directly to customers or indirectly through distributors or partners.

13. ACPW has incurred net operating losses in virtually every quarter of its history. Indeed, it incurred net losses for every year between 2008 and 2012, inclusive. Accordingly, ACPW "needs to generate significant additional revenue while maintaining [its] current margins in order to achieve profitability."

14. ACPW has planned to generate this revenue by selling and marketing conducted through its four regional offices, in Texas, Germany, the United Kingdom, and in Beijing, China.

15. ACPW has been expanding its sales in international markets, with non-North

America sales increasing from 29% to 40% of total revenues between 2010 and 2012.

16. ACPW directs its marketing through four regional centers, located in

17. In recent years, ACPW has attempted to expand its UPS sales into China and Asia. The China market in particular is critical to ACPW's UPS plans. ACPW has repeatedly pointed out that ACPW was succeeding in expanding its business into these very lucrative markets.

18. For example, in a conference call taking place on April 30, 2013, Defendant Milner specifically noted that shipments to China represented 21% of ACPW's sales. He added:

> Asia and in particular China is a key geography for the business and one where we will continue to make investments to leverage a rapidly expanding data center market. ***To that end, we announced in conjunction with today's earnings press release that we've entered into a strategic distribution partnership with Digital China Information Service Company Limited, the largest IT solutions provider in China.***[1]

19. Thus, as Defendant Fife added: "[R]evenue […] benefited from increased shipments to China, which drove $2.3 million increase in revenue from Asia."

20. And Defendant Milner added:

> *To that end, we announced in conjunction with today's earnings press release that we've entered into a strategic distribution partnership with Digital China Information Service Company Limited, the largest IT solutions provider in China.*

21. And:

> *First we expanded our market reach in Asia having signed a strategic distribution partnership with Digital China in the first quarter of 2013. Digital China Information Service Company Limited is Chinese number one IT solutions distribution and system integration firm. And, it's a subsidiary of Digital China Holdings Limited, a $9.1 billion business in 2012. We've already began collaborating with Digital China on a number of key datacenter initiatives for which we expect to begin product deployments later this year. This move is part of our overall growth strategy and enables us to capitalize on a datacenter colocation market in China, forecasted to grow at a 40% compound annual growth rate through 2016 according to a March 2013 report from Datacenter Dynamics Intelligence. China is also expected to increase its national investment in cloud computing infrastructure 250%, $286 million in 2011 to $1 billion by 2016 according to IDC.*

22. And Defendant Milner emphasized that ACPW would be at a competitive

disadvantage in China without such a large partner:

> **Carter W. Driscoll – Ascendiant Capital Markets LLC**
> Okay with that. Maybe talk about the deal size that you're initially finding in China versus other geographies, is it larger and I'm assuming it is and then if so, what impact that has your margins there? Obviously you already have a bit of a margin impact of manufacturing in Austin, but you kind of trend to help us as we build our expectations in for growth in China, what that may or may not do your gross margins?
>
> **J. Douglas Milner**
> Yeah, the deal size really depends on the type of customer and we've encountered all types of customers. So we've sold just a couple of systems doing enterprise datacenter for one example and then the co-location data center deals tend to be about the same size as they are here and maybe a little bit bigger than they are in Europe. And so, the customers have similar scale. We are going to, since we are going through multi-tier distribution. ***In China, our margins are going to be somewhat lower, because there we've got basically provide margin for that channel. But we also are much more efficient on the back end of selling and support because we have such a large partner in China.***
>
> From overall net impact, I think there will be some, I don't think it's going to be remarkable, but our gross margins will be noticeably lower. I think our spending to support that market from an overhead perspective will also be noticeably lower because of the type of partner that we have there.

23.     Indeed, ACPW mentioned the partnership with ACPW as one of its few Q1 2013 highlights, informing investors that it expected good financial results because it had formed a "[n]ew strategic distribution partnership agreement with Digital China Information Service Company Limited, the largest IT solutions provider in China."

24.     Based on the Q1 2013, financial results, ACPW filed a shelf registration statement, aiming to register $50 million of stock for resale. The registration statement was declared effective on July 1, 2013.

25.     On July 9, 2013, ACPW announced Defendant Milner's unexpected resignation, effective July 29, 2013.

26.     On July 30, 2013, ACPW announced its Q2 2013 results, and held a conference call

---

[1] Unless otherwise noted, all emphases are added.

to discuss them. Defendant Fife said:

> I'd say geographically we continue to see a lot of strong interest in from all of the regions if anything – I think our China business is maybe a little bit slower than we anticipated it at this point in time but we still remain very optimistic about the market size and the opportunities throughout in that market. And we expect that the 750 we will be shipping that during the quarter, it's going to come out a little bit later than we had anticipated and so that's also having a little bit of an impact in the quarter from what we had previously anticipated. But are encouraged by all indications of where we'll end up by for the year in total.

27. And, specifically as to Digital China, Defendant Fife added:

> **Jeff Osborne** - Stifel, Nicolaus & Co
> Okay. And then last question, any comments with the new China partner and how the training there and synergies are ramping in terms of joint sales pitches and what that?
> **Steven Fife**
> Yes. Well, I guess first of all as Ake said we hired a new General Manager for our Asia business and he's been in place for a few weeks now and I think it's going to add tremendously to our over side and frankly closing opportunities that we've identified in China in particular but he's met with a number of our key customers end customers as well as with our distributor partner that we entered into an – Digital China as we entered into an agreement with back in the end of Q1 and he's working through those details but yet we do have Digital China has dedicated peoples we're starting to set up formal trainings with them and with our team and there are joint calls that are taking place right now.

28. But in reality, ACPW's partnership was not with Digital China, or any affiliate or subsidiary of Digital China. Rather, as ACPW announced when it retracted its 2013 guidance on September 5, 2013, after close of trading:

> The lower than expected sales in China are due to disappointing results from the company's distribution relationship in China. The company previously announced in error that a partnership agreement with Digital China Information Service Company Limited was entered into on April 30, 2013. However, the company's previously announced agreement in China is with Qiyuan Network System Limited, which the company's management discovered is neither an affiliate nor a subsidiary of Digital China Information Service Company Limited.
>
> "While we remain optimistic about our long-term market opportunity in China, our experience this year in China has been very disappointing and for now is unpredictable," said Steve Fife, CFO, and vice president of Finance, for Active Power.

29. On September 6, 2013, ACPW's stock price fell $0.48 from $3.50 to $3.02, or about 13.71%, damaging investors.

6

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

30. Plaintiff brings this action as a class action on behalf of himself and on behalf of all purchasers of common stock of Active Power during the Class period, (the "Class"), pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the class. Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

31. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Active Power securities were actively traded on the NASDAQ exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Active Power or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

32. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

33. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

34. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that

would establish incompatible standards of conduct for the party opposing the Class.

35.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the April 30, 2013 Press Release and April 30, 2013 8-K filing issued by Defendants to the investing public misrepresented material facts concerning Active Power and its business; and

(c)     the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

37.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

  (b) The omissions and misrepresentations were material;

  (c) The Company's stock traded in an efficient market;

  (d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

  (e) Plaintiff and other members of the Class purchased Active Power common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

  38. At all relevant times, the market for Active Power common stock was efficient for the following reasons, among others:

  (a) As a regulated issuer, Active Power filed periodic public reports with the SEC; and

  (b) Active Power regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

  (c) Several hundreds of thousands of shares of Active Power shares were traded on a weekly basis, demonstrating a strong presumption of an efficient market.

  (d) Active Power was eligible and did file short-form registration statements with the SEC on Form S-3.

  (e) Active Power was followed by numerous analysts that issued reports about the Company.

  (f) New company specific information was rapidly reflected in the Company's stock price.

(g)     Many market makers made a market in the Company's stock.

## COUNT I

### (Against All Defendants For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

39.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

40.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

41.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Active Power securities; and (iii) cause Plaintiff and other members of the Class to purchase Active Power securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

42.      Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the

defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Active Power securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Active Power's finances and business prospects.

43.     By virtue of their positions at Active Power, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

44.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Active Power, the Individual Defendants had knowledge of the details of Active Power internal affairs.

45.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Active Power. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to

11

disseminate timely, accurate, and truthful information with respect to Active Power's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Active Power securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Active Power's practices which were concealed by defendants, Plaintiff and the other members of the Class purchased Active Power securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

46.     During the Class Period, Active Power securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Active Power securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of Active Power securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Active Power securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

47.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section l0(b) of the Exchange Act and Rule l0b-5 promulgated thereunder.

48.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of §20(a) of the
### Exchange Act Against Defendant Steven Fife)

49.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

50.     During the Class Period, the Individual Defendants participated in the operation and management of Active Power, and conducted and participated, directly and indirectly, in the conduct of Active Power's business affairs. Because of their senior positions, they knew the adverse non-public information about Active Power's corporate governance violations and false financial statements.

51.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Active Power's financial condition and results of operations, and to correct promptly any public statements issued by Active Power which had become materially false or misleading.

52.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Active Power disseminated in the marketplace during the Class Period concerning Active Power's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Active Power to engage in the wrongful

acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Active Power within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Petro china securities.

53.     Each of the Individual Defendants, therefore, acted as a controlling person of Active Power. By reason of their senior management positions and/or being directors of Active Power, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Active Power to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Active Power and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

54.     By reason of the above conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 10, 2013    **PAYNE MITCHELL LAW GROUP**

*/s/ Andrew L. Payne*_____
**ANDREW L. PAYNE**
State Bar No. 00791416
**R. DEAN GRESHAM** (not currently admitted)
State Bar No. 24027215
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
Tel: (214) 252-1888
Fax: (214) 252-1889
andy@paynemitchell.com
dean@paynemitchell.com

And

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq. (not currently admitted)
NY State Bar No. 2255214
Phillip Kim, Esq. (not currently admitted)
NY State Bar No. 4145397
Jonathan Horne, Esq. (not currently admitted)
NY State Bar No. 4822847
275 Madison Avenue, 34th Floor
New York, NY  10016
Phone: (212) 686-1060
Fax: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com

jhorne@rosenlegal.com

Counsel for Plaintiff