IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2014 JUL -2  AM II: 57

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY

DON LEE, INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY SITUATED,
        Plaintiffs,

-vs-                                              Case No.  A-13-CA-797-SS

ACTIVE POWER, INC., STEPHEN R. FIFE, and
DOUG MILNER,
        Defendants.

---

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendants Active Power, Inc., Stephen R. Fife, and Doug Milner's Motion to Dismiss [#29], Plaintiffs' Response [#31], and Defendants' Reply [#32]. Having considered the documents, the file as a whole, and the governing law, the Court enters the following opinion and orders DENYING the motion.

### Background[1]

This is a securities fraud class action on behalf of a class consisting of purchasers of the common stock of Active Power, Inc. between February 19, 2013, and September 5, 2013 (the Class Period). Active Power develops, builds, and sells Uninterruptible Power Supply (UPS) products. Am. Compl. [#26], ¶ 2. Active Power has been selling its products in China since 2005, and in 2010, it established a regional office in Beijing—its fourth regional office overall—to oversee its China

---

[1] The following recounting of the nature of this case derives from the Plaintiffs' Amended Complaint [#26] as the facts alleged therein are taken as true for present purposes. *See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

and Southeast Asia operations. *Id.*, ¶¶ 3–4. These regional offices control all of the operations within their respective geographic reach, making them a major investment for Active Power. *Id.*, ¶ 4. To manage the Beijing office and oversee all of the China operations, Active Power hired Huan Wang, an industry veteran. *Id.*, ¶ 5. Wang was interviewed along with Active Power's Chief Financial Officer (CFO) for media articles and quoted in press releases concerning Active Power's China operations. *Id.*, ¶ 5. The Beijing office disappointed, however, with sales increasing in 2011, but losing about a third of the gain in 2012. *Id.*, ¶ 7. Profit margins were also lower than in other regions due to lower prices and increased shipping costs. *Id.*

On February 19, 2013, Active Power reported it had begun working with a new unnamed Chinese distribution partner, and this new partnership would reverse Active Power's lagging trends in China and Asia generally. *Id.*, ¶ 8. On April 30, 2013, Active Power announced in two separate press releases that the partner was Digital China Information Technology Systems, Inc. (Digital China), one of China's leading information technology solutions providers and a subsidiary of a $9.1 billion Chinese public company listed in Fortune's China 100. *Id.* One of the press releases included a quote from a purported Digital China Vice President touting the partnership. *Id.* Active Power also issued a 10-Q reflecting $4.186 million of purported sales to Digital China. *Id.*, ¶¶ 8, 70. In conference calls held on April 30, 2013, Active Power repeatedly advertised its partnership with Digital China and represented the two companies were already collaborating on specific key initiatives. *Id.*, ¶ 8. Active Power indicated it planned to release the products of this collaboration in 2013. *Id.* Doug Milner, Active Power's Chief Executive Officer (CEO), stated that with Digital China distributing its products at lower costs, Active Power could compensate for the higher shipping costs and lower prices previously hampering its profit margins. *Id.*

But there was a problem: Active Power never had an agreement with Digital China. *Id.*, ¶ 9. Rather, the contract was with Qiyuan Network System Limited (Qiyuan), a small Hong Kong firm. *Id.* In September 2013, Active Power announced an employee had intentionally lied to it, claiming Qiyuan was a subsidiary of Digital China when the two actually had no affiliation. *Id.* The employee was Wang, and it turns out his wife was a Qiyuan director and held 20% of its shares with three other directors and an investment fund also each holding 20% and a directorship. *Id.*, ¶ 11.

Due to this falsehood, Active Power had to issue a financial restatement. In previous statements from quarters ending March 31 and June 30, 2013, it had indicated $4.186 million in sales as a result of this new partnership premised on the notion these sales with Digital China, a major company, were reasonably assured to be collected under Generally Accepted Accounting Principles. *See id.*, ¶¶ 52–58, 70. The collectability of this $4.186 million was not reasonably assured with Qiyuan, a small company with a minimal track record. *Id.*, ¶¶ 63, 70. Consequently, Active Power was obligated to issue the restatement. Active Power also indicated Qiyuan had made payments on some of the product shipped to it and returned the rest of the product to Active Power. *Id.*, ¶ 105.

Plaintiffs filed this lawsuit in September 2013 against Defendants Active Power, Inc., CEO Doug Milner, and CFO Stephen R. Fife, asserting violations of § 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. *Id.*, ¶¶ 132–41. Plaintiffs also allege the individual Defendants, Milner and Fife, had direct control over the activities and public statements of Active Power, participated in the improper activities and fraudulent statements in question, and are therefore liable as "control persons" under § 20(a) of the Securities Exchange Act. *Id.*, ¶¶ 142–46.

Defendants have now filed the instant motion to dismiss, arguing Plaintiffs have failed to allege scienter, and therefore the claims should be dismissed pursuant to Federal Rule of Civil

Procedure 12(b)(6).  Mot. Dismiss [#29], at 1.  In essence, Defendants argue Wang was the sole bad actor in this drama.  They do not deny wrongdoing occurred but dispute they were involved or can be held liable.  They claim Wang was a rogue employee who lied to Milner and Fife.  They concede Wang told them about a new distributor agreement with Qiyuan, and Wang told them Qiyuan was a subsidiary of Digital China.  But they claim they did not know Qiyuan actually had no affiliation with Digital China.  While there appears to be no dispute Wang acted with scienter, Defendants contend the requisite scienter cannot be attributed to any of the Defendants.

As to Active Power, Defendants argue Wang's scienter cannot be imputed because Wang never actually made the statements on which the suit is based.  *Id.*  For this argument, Defendants rely on a recent Supreme Court opinion, which they construe as altering existing Fifth Circuit law.  *Id.*  According to Defendants, Wang's scienter also cannot be imputed to Active Power because Wang was acting contrary to Active Power's interests.  *Id.*

As to Milner and Fife, Defendants assert Plaintiffs have failed to allege facts giving rise to a strong inference of severe recklessness.  *Id.*  Under their view, Milner and Fife reasonably relied on Wang, a seasoned industry veteran, to manage Active Power's operations in China and provide honest reports regarding any distributor agreements.  *Id.*  Defendants contend Plaintiffs fail to allege any facts indicating Milner and Fife were aware of the fraudulent scheme or deliberately disregarded indicators that would have made them aware.  *Id.*

While Defendants primarily focus on the issue of scienter, they make two other arguments toward the end of their motion seeking partial dismissals.  First, they argue the Class Period should not begin February 19, 2013, because the alleged false statements made by Milner in a conference call did not even mention Digital China and cannot form the basis of a false statement for securities

fraud purposes. *Id.* at 17.  Second, they request the dismissal of the § 20(a) control-person claim on

the ground Plaintiffs have failed to establish an independent violation of the securities laws from

which liability under § 20(a) could flow. *Id.* at 18.  In other words, Defendants argue the § 10(b) and

Rule 10b-5 claims must be dismissed on scienter grounds, and the § 20(a) claims must be dismissed

because there is no predicate securities fraud offense under § 10(b).

**Analysis**

**I.       Rule 12(b)(6)—Legal Standard**

A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint

for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  In deciding

a motion to dismiss under 12(b)(6), a court generally accepts as true all factual allegations contained

within the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507

U.S. 163, 164 (1993).  However, a court is not bound to accept legal conclusions couched as factual

allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Although all reasonable inferences will

be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory

allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994).  The plaintiff

must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Although

a plaintiff's factual allegations need not establish the defendant is probably liable, they must establish

more than a "sheer possibility" that a defendant has acted unlawfully. *Id.*  Determining plausibility

is a "context-specific task," that must be performed in light of a court's "judicial experience and

common sense." *Id.* at 679.  In deciding a motion to dismiss, courts may consider the complaint, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## II.    Securities Fraud—Legal Standard and Heightened Pleading Standard

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege "(1) a misstatement or omission (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002).  A § 10(b) claim is subject to both Federal Rule of Civil Procedure 9(b)'s requirement fraud be pled "with particularity" and the requirements of the Private Securities Litigation Reform Act (the PSLRA).  *Id.*

The PSLRA "was enacted in response to an increase in securities fraud lawsuits perceived as frivolous." *Newby v. Enron Corp.*, 338 F.3d 467, 471 (5th Cir. 2003).  The PSLRA enhanced the particularity requirements for pleading fraud under Rule 9(b) in two ways. *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).  First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading[,]" 15 U.S.C. § 78u-4(b)(1)(B), and secondly, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  The Fifth Circuit has found the requirements of the PSLRA comport with those of Federal Rule of Civil Procedure 9(b), which "requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).  In short, "the who, what, when, and where must be laid out before access to the discovery process is granted." *Id.* at 349

(internal quotations omitted).  A district court must dismiss a securities fraud claim failing to satisfy either the PSLRA's pleading requirements or those of Rule 9(b).  *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).

## III.    Scienter

The central disputed issue in Defendants' motion to dismiss is whether Plaintiffs adequately pleaded scienter—*i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319.  With respect to Active Power, the issue is not whether Plaintiffs have satisfied the substantive pleading requirements of scienter but whether Wang's scienter may be imputed to Active Power, a corporate entity.  With respect to Milner and Fife, the issue is whether Plaintiffs have adequately pleaded scienter for these individual actors.  The Court first addresses Active Power's corporate scienter, and then Milner and Fife's individual scienter.

## A.    Wang's scienter may be imputed to Active Power

To hold Active Power liable, Wang's scienter—which the parties do not dispute he possessed, at least for the purposes of the instant motion—must be imputed to Active Power.  Defendants argue Wang's scienter cannot be imputed to Active Power for two reasons: (1) Wang did not "make" any of the alleged false statements at issue; and (2) Wang was acting for his own purposes and against those of Active Power.  The Court addresses both arguments in turn.

### 1.    Corporate scienter post-*Janus*

The parties disagree as to the proper legal standard to be applied when imputing scienter from a corporate employee to the corporation itself.  Plaintiffs argue Fifth Circuit case law, represented by the seminal case *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004), allows for the imputation of scienter from an employee who "makes" a false statement or an

employee like Wang who "furnished information" used in a false statement.  Defendants rely on a

more recent Supreme Court case, *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct.

2296 (2012), to contend the meaning of to "make" a statement does not include merely "furnishing"

information.  By extension, Defendants argue imputation from a corporate employee is allowed only

where the employee "made" the false statement.  Since Wang did not "make" any of the false

statements himself (rather, he "furnished" the false information Milner and Fife used to actually

"make" the false statements), Defendants claim Wang's scienter may not be imputed to Active

Power.  For the reasons described below, the Court concludes *Southland* still is controlling law on

the issue of imputation, and Defendants overstate the impact of *Janus* on the instant issue.

In *Southland*, the Fifth Circuit rejected the "group pleading" approach to corporate scienter.

*Southland*, 365 F.3d at 366.  Specifically, the court established the proper standard as follows:

> For purposes of determining whether a statement made by the corporation was made
> by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state
> of mind of the individual corporate official or officials who make or issue the statement
> (or order or approve it or its making or issuance, *or who furnish information or
> language for inclusion therein, or the like*) rather than generally to the collective
> knowledge of all the corporation's officers and employees acquired in the course of
> their employment.  This is consistent with the general common law rule that where,
> as in fraud, an essentially subjective state of mind is an element of a cause of action
> also involving some sort of conduct, such as a misrepresentation, the required state
> of mind must actually exist in the individual making *(or being a cause of the making
> of)* the misrepresentation, and may not simply be imputed to that individual on
> general principles of agency.

*Id.* at 366 (citations and footnotes omitted) (emphasis added).

In this case, there is no debate Wang told Milner and Fife Qiyuan was a subsidiary of Digital

China, and he did so knowing this was not true.  Milner and Fife ultimately broadcast this false

information in various statements.  In other words, Wang furnished information for inclusion in the

false statements with scienter, and he was a cause of the making of the misrepresentations.  Therefore, under *Southland*, Wang's scienter may be imputed to Active Power.

Defendants contend "[t]he 'furnish information' language in [*Southland*] reflected a now-obsolete understanding of who could be sued under § 10(b) and Rule 10b-5."  Mot. Dismiss [#29], at 7.  Defendants believe *Southland*'s "furnish information" language is now obsolete based on their reading of *Janus*.  In *Janus*, a mutual fund allegedly made false statements in its communications to investors.  *Janus*, 131 S. Ct. at 2300.  The false statements were allegedly drafted by the fund's adviser, a separate legal entity.  *Id.* at 2300–01.  In addressing whether the third party adviser could be held liable in a private action under § 10(b) and Rule 10b-5, the Court concluded the adviser did not "make" the mutual fund's statements, and therefore could not be held liable for the allegedly false statements the mutual fund made to investors.  *Id.* at 2301.  The Court held: "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Id.* at 2302.

The Court fails to see how *Janus* makes the "furnish information" language from *Southland* obsolete as the two cases address distinct issues.  *Janus* defined who "makes" a statement; the "furnish information" language from *Southland* defined from whom scienter may be imputed for the purposes of corporate liability.  Put another way, in *Janus* the issue was the liability of the third party adviser, and the Court held it could not be held liable because it did not "make" the statement.  Rather it furnished information to the mutual fund, which "made" the statement at issue.  In this case, Wang is analogous to the third party adviser, but the issue here is not whether Wang "made" the statements, which would make him potentially liable.  The issue is if Wang's scienter can be imputed to Active Power so that Active Power might be held liable.  Applying *Janus* to this case, it may well be true Wang

did not "make" the false statements.[2] But Plaintiffs are not contending Wang "made" the statements. Instead Plaintiffs are arguing Wang furnished information with scienter, and therefore this scienter can be imputed to the corporation, Active Power, as established by *Southland*.

Defendants somehow interpret *Janus* to have changed *Southland* to mean that in order to impute scienter from a corporate employee to the corporation, the employee must have "made" the statement. But *Janus* says no such thing. *Southland* made clear that in order to impute scienter from a corporate employee to the corporation, the employee must have "made" the statement, or "ordered or approved it or its making or issuance," or "furnished" information or language for inclusion therein, or "the like." *See Southland*, 365 F.3d at 366. "This is consistent with the general common law rule that . . . the required state of mind must actually exist in the individual making *(or being a cause of the making of)* the misrepresentation." *Id.* (emphasis added). *Janus*, which simply defines who "makes" a statement and can therefore be held liable, does not change this holding.

---

[2]The Court does not address whether Wang "made" these statements because, as explained, this is not the Plaintiffs' contention. Nevertheless, the Court notes its concerns as to how *Janus* would affect this case if it were applicable. While *Janus* may suggest Wang did not "make" the statement because he was not "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it," this conclusion is not obvious. *Janus*, 131 S. Ct. at 2302. The ambiguity lies in the factual comparison between *Janus*, which entailed an investment advisor providing allegedly false information to a separate legal entity in the mutual fund, and this case, which involves a corporate employee providing allegedly false information to other officers of the company. Indeed, the Court in *Janus* emphasized the fact the adviser and the mutual fund were "legally separate entities" that observed corporate formalities. *Id.* at 2304. Moreover, Justice Breyer, in his dissent, expressed concerns over the potential applicability of the majority's holding to a corporate insider situation involving the use of innocent intermediaries—which, according to Defendants, describes the instant case—and the "loophole" the majority opinion "may well create." *Id.* at 2310–11 (Breyer, J. dissenting). In other words, *Janus* may apply to such situations, but its holding did not address them. *See id.* at 2304 n.10 ("We do not address whether Congress created liability for entities that act through innocent intermediaries in 15 U.S.C.A. § 78t(b)."). Finally, other courts have rejected attempts to apply *Janus* to corporate insider scenarios. *See, e.g., In re Pfizer Inc. Sec. Litig.*, 936 F. Supp. 2d 252, 269 (S.D.N.Y. 2013) ("*Janus* 'addressed only whether *third parties* can be held liable for statements made by their clients. Its logic rested on the distinction between secondary liability and primary liability . . . and has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability.'") (quoting *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012)); *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, Nos. 05-1151 (SRC), 05-2367 (SRC), 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011) (similar).

This interpretation is consistent with the case law post-*Janus*.  In the only on-point Fifth Circuit opinion, *Pipefitters Local No. 636 Defined Ben. Plan v. Zale Corp.*, 499 F. App'x 345 (5th Cir. 2012) (unpublished), the court implicitly indicated *Southland*'s "furnish information" language is still controlling law.  In *Zale*, Higgins, the vice-president of marketing and a non-party in the case, made false accounting determinations resulting in incorrect numbers being used in financial statements, which formed the basis of a class action securities fraud claim against Zale and several of its chief officers.  *Id.* at 346–48.  There was no allegation Higgins "made" any of false statements herself; rather she furnished the false numbers ultimately used in the financial statements.  The Plaintiffs, however, sought to impute Higgins's scienter to Zale and the individual Defendants.  *Id.* at 348.  The district court dismissed the case because it found the alleged facts did not create a strong inference Higgins had intended to defraud investors or had acted with severe recklessness.  *Id.*  The district court concluded there were simply not enough facts to say Higgins was obviously aware her inaccurate accounting could or would eventually result in Zale releasing misleading financial statements with material errors.  *Id.*  The Fifth Circuit affirmed the district court's conclusion and used the same analysis: "Because Pipefitters has not raised a strong inference that any of the three Individual Defendants, *or any other Zale official responsible for the allegedly fraudulent statements*, acted with scienter, the district court's order dismissing Pipefitters' complaint with prejudice is affirmed."  *Id.* at 351 (emphasis added).

This opinion indicates, albeit in an unpublished opinion, that *Southland*'s "furnish information" language is alive and well.  Under Defendants' view, the district court (and the Fifth Circuit) should have never even addressed whether Higgins acted with scienter; since she never "made" any statement, her scienter could not be imputed to Zale or the individual Defendants

anyway. The district court (and the Fifth Circuit), however, closely analyzed whether Higgins acted

with scienter, which means imputation is permissible from those who merely "furnish information."

Other district courts have reached the same conclusion. In *Kerr v. Exobox Technologies*

*Corp.*, No. H-10-4221, 2012 WL 201872 (S.D. Tex. Jan. 23, 2012), Judge Ellison addressed this

precise issue and concluded *Janus* did not alter *Southland*:

> The question thus becomes whether Exobox had scienter when it made the
> statements contained in its registration filings and amendments. In determining
> whether the Complaint adequately pleads scienter with respect to Exobox, the Court
> must look to see if any of the corporate officials who made or prepared the statement
> acted with scienter. The standard articulated by the Fifth Circuit in *Southland*, and
> repeated in many subsequent cases, provides that it is appropriate to look at the state
> of mind not only of the individual corporate official or officials who made the
> statement, but also those who "order or approve it or its making or issuance, or who
> furnish information or language for inclusion therein or the like." *Id*; *see also Shaw
> Group*, 537 F.3d at 533 (repeating this standard post-*Stoneridge* ). The Court finds
> no reason to read *Janus* to limit the liability of the corporation on grounds of scienter.
> Exobox "made" the statements contained in the public filings under *Janus;* Plaintiffs
> need only assert that Sonfield furnished the information or language for inclusion in
> order to attribute his scienter to Exobox.

*Id.* at \*14. Other courts, while not addressing this precise issue, have continued to use *Southland*'s

"furnish information" language when describing the legal standard applicable to corporate scienter. *See*

*Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 690–91 (S.D. Tex. 2013) (Rosenthal, J.); *N. Port*

*Firefighters' Pension—Local Option Plan v. Temple Inland*, 936 F. Supp. 2d 722, 757 (N.D. Tex.

2013) (Boyle, J.). Finally, the Court notes Defendants have not cited a single case which actually holds

that, in light of *Janus*, the "furnish information" language from *Southland* is no longer good law.

In sum, the Court rejects Defendants' view that Wang's scienter cannot be imputed to Active

Power because Wang did not "make" the alleged false statements under *Janus* as this is not a legal

requirement under *Southland*. Plaintiffs have sufficiently pleaded Wang furnished false information

to Milner and Fife, and Wang furnished this information with scienter.  Accordingly, Wang's scienter may be imputed to Active Power.

> ### 2.      Wang did not act adversely to Active Power in the meaning of *Kaplan*

Defendants next argue Wang's scienter cannot be imputed to Active Power because Wang was acting adversely to Active Power's interests.  To support this contention, Defendants rely on the Fifth Circuit opinion, *Kaplan v. Utilicorp United, Inc.*, 9 F.3d 405 (5th Cir. 1993), and this Court's previous decision, *In re Netsolve, Inc. v. Sec. Litig.*, 185 F. Supp. 2d 684 (W.D. Tex. 2001).  In *Netsolve*, this Court addressed *Kaplan* and the principle it supported:

> To support its contention that the individual defendants' scienter cannot be imputed to NetSolve because the defendants plotted to harm the company, Netsolve cites [*Kaplan*].  In *Kaplan*, the Circuit dismissed a securities fraud complaint against the company, because the two individual defendants had acted to steal money directly from the company for their personal use.  *See id.* ("[T]he knowledge and actions of employees acting adversely to the corporate employer cannot be imputed to the corporation.").  Here, however, the plaintiffs allege the individual defendants acted to artificially raise NetSolve's stock price, not directly steal money from its coffers.  An artificial raise in the stock price, in most cases, benefits the company.  In addition, the vast majority of securities fraud cases (in this Court, at least) allege that individual defendants misled the market to artificially raise their company's stock price, and then sold their shares.  If the Court were to accept the defendants' argument, such causes of action would be eliminated.  While this is an appealing prospect in terms of the Court's workload, it is not a valid application of the federal securities laws. This ground for dismissal is overruled.

*Netsolve*, 185 F. Supp. 2d at 697.

The Court applies the same analysis to this case and reaches the same conclusion.  In *Kaplan*, the corporate officers had misappropriated millions of dollars for personal use.  In this case, Wang did not misappropriate or steal money from Active Power.  Plaintiffs' allegations support a story with more nuance whereby Wang, while certainly benefitting himself (and his wife) with his deceit, also benefitted Active Power in its efforts to bolster its perception in the eyes of investors.

-13-

According to Plaintiffs' Amended Complaint, Active Power's China office, which was established in 2010, was not achieving the results Active Power had promised investors by the end of 2012. Active Power had made statements like "the China market will account for 20 to 25 percent of our global business within five years," or 2015. Am. Compl. [#26], ¶ 79. Yet all of Asia accounted for only 8% of Active Power's 2012 revenues. With this backdrop, Plaintiffs depict a scene where the stakes were high, and Active Power was under tremendous pressure to deliver on promises made to investors. Specifically, Active Power had to honor its pledge 2013 would be the year it would focus on China and meet the expectations it had set for itself in the eyes of investors.

The partnership agreement with Qiyuan was supposed to be a huge component of Active Power's China strategy. Milner and Fife claim they did not know the true nature of Qiyuan and relied on Wang for the notion Qiyuan was a subsidiary of Digital China. Nonetheless, Wang set up the deal with Qiyuan and represented Qiyuan as affiliated with Digital China in an effort to strengthen Active Power's investment profile. While Wang's wife was apparently a 20% owner of Qiyuan, and Wang perhaps stood to benefit personally from this arrangement, it is simultaneously true the arrangement served to bolster Active Power. Indeed, the day it announced the Digital China partnership, Active Power filed a registration statement to sell $50 million of common stock. *Id.*, ¶ 85. Defendants point out this filing was merely a "'shelf' registration process" and does not mean Active Power actually sold any securities out of this $50 million. Defs.' Reply [#32], at 6. The point, however, is not that Active Power actually benefitted from its representations concerning the Digital China agreement but rather that the deal was intended to benefit Active Power.

Of course, the Qiyuan deal was predicated, in part, on a lie, and Active Power ended up suffering negative consequences as a result through, among other things, a drop in its stock price.

But if defendants could get securities fraud claims dismissed whenever an employee's fraudulent statements to the market ultimately result in harm to the company, then "the vast majority of securities fraud cases (in this Court, at least) . . . would be eliminated.  While this is an appealing prospect in terms of the Court's workload, it is not a valid application of the federal securities laws." *Netsolve*, 185 F. Supp. 2d at 697; *see also In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1087 (N.D. Cal. 2001) (observing "chickens have a way of coming home to roost" and noting "misstatements disseminated to a securities market seldom, if ever, benefit the issuer of the securities").

In sum, the Court is unconvinced by Defendants' comparison of Wang to the embezzlers in *Kaplan*.  Falsely promoting a deal which on its face benefits a company but ultimately harms it upon exposure of the falsehood is not the equivalent of secretly embezzling money from the company.  It is worth noting Qiyuan actually made payments on some of the product it received, and it returned the rest of the unsold product to Active Power once Active Power apparently realized Qiyuan was not, in fact, a subsidiary of Digital China.  These acts are not consistent with Defendants' characterization of Wang as stealing from Active Power.  The Court rejects Defendants' argument Wang's scienter may not be imputed to Active Power because Wang was acting adversely to Active Power's interests.

**B.      Plaintiffs' allegations support a strong inference Milner and Fife acted with scienter**

In contrast to the above discussion involving whether the undisputed scienter of Wang could be imputed to Active Power, Plaintiffs do not allege Wang's scienter may be imputed to Milner and Fife, who were the CEO and CFO respectively during the relevant time period.  Instead, Plaintiffs allege Milner and Fife possessed scienter themselves in their actions.

Both intent and "severe recklessness" are sufficient to satisfy the substantive scienter requirement. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 407–08 (5th Cir. 2001). Severe recklessness is not mere negligence, but is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and present a danger of misleading . . . which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 408. Under the PSLRA, a complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind" in order to avoid dismissal. 15 U.S.C. § 78u04(b)(2) (emphasis added); *Tellabs*, 551 U.S. at 314.

The Supreme Court has detailed a three-step process for reviewing allegations of scienter on a motion to dismiss pursuant to the PSLRA. *See Ind. Elec.*, 537 F.3d at 533 (citing *Tellabs*, 551 U.S. at 322–23). First, the facts alleged in the complaint are to be taken as true. *Id.* Second, those facts must be considered holistically, rather than in isolation, to determine whether scienter has been properly pleaded, as the proper inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. Finally, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. *Ind. Elec.*, 537 F.3d at 533 (citing *Tellabs*, 551 U.S. at 523). "[T]o qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The inference of scienter need not be irrefutable, but it must be strong in light of other explanations. *Id.*

Defendants contend Milner and Fife relied on Wang, a seasoned industry veteran, and trusted him to provide accurate information. While hindsight shows their trust was misplaced,

Defendants argue this sort of honest reliance does not amount to the sort of severe recklessness required for scienter. Defendants point out Plaintiffs' allegations repeatedly indicate Wang lied to Milner and Fife, and these two senior executives relied on Wang for information related to China. *See* Defs.' Reply [#32], at 8. Defendants assert Milner and Fife did not have any motive to participate in Wang's fraudulent scheme, and they highlight the absence of any allegation Milner and Fife sold any Active Power Stock after announcing the Digital China distribution agreement. The Court agrees the alleged facts emphasized by Defendants support plausible inferences of nonfraudulent intent on the part of Milner and Fife.

These alleged facts, however, support "cogent and at least as compelling" inferences to the contrary. Plaintiffs' central contention concerning Milner and Fife's scienter concerns their failure to disclose to the public Qiyuan as the actual partner at any point during the relevant time period. In other words, Wang told Milner and Fife he had negotiated a distributor agreement with Qiyuan, and Qiyuan was a subsidiary of Digital China. As it turns out, Qiyuan was not a subsidiary of Digital China, but the Plaintiffs do not allege Milner and Fife falsely stated Qiyuan was a subsidiary of Digital China. Indeed, therein lies the key problem: Milner and Fife never told the investing public the distributor agreement was with Qiyuan, a subsidiary of Digital China. Instead, Milner and Fife, without exception, said Active Power had an agreement with Digital China, knowing full well the deal was with Qiyuan. And Milner and Fife, according to Plaintiffs' allegations, made numerous statements about their relationship with Digital China (never mentioning Qiyuan), including that Digital China had dedicated resources to Active Power, that Active Power and Digital China were holding joint sales calls, and that Active Power had experienced success reselling

through Digital China's network.  *See* Am. Compl. [#26], ¶ 101 (documenting all of the alleged false statements made by Milner and Fife).

Defendants argue Milner and Fife were merely parroting what Wang told them, and they cannot be held responsible for doing so.  But Milner and Fife did not just repeat what Wang told them; they omitted crucial information.  If Milner and Fife had merely stated in Active Power's financial statements and in their investor phone calls what Wang told them, then they would have reported the fact the distributor agreement was with Qiyuan, a subsidiary of Digital China.  If they had done so, Plaintiffs allege, then the fraud could have been easily discovered by the investment analysts and other members of the public conducting some basic online research into Qiyuan. Wang's fraud would have been nipped in the bud, but Milner and Fife continuously represented the deal was with Digital China, enabling the fraud to persist.

While representing to the public a distributor agreement is with a parent corporation when the transaction is actually with a subsidiary may not necessarily indicate scienter by itself, Plaintiffs also allege Milner and Fife's specific representations about the agreement suggested to the public Active Power would reap the benefits of working with a large player in China when the reality, as Milner and Fife claim to have understood it, was they would be working with a small subsidiary in Qiyuan.  For example, when an analyst asked Milner about Digital China's geographical reach, Milner described Digital China's reach without disclosing that Active Power's relationship would give it access only to those areas accessible to Qiyuan. *See* Am. Compl. [#26], ¶ 82. Perhaps there is an inference Milner and Fife understood the arrangement with the subsidiary Qiyuan to provide Active Power access to the parent Digital China's network, but why did Milner and Fife not just say so?  They could have told the public the deal was actually with the smaller Qiyuan, but they

anticipated having access to Digital China's broader network. Their failure to do so gives rise to an inference they were hiding the true nature of the relationship with an intent to deceive. As Plaintiffs portray it, Milner and Fife knew Qiyuan was a small company with a minimal network compared to Digital China, but they wanted the public to believe the relationship was really with the parent. If the public knew the relationship was with the comparatively unimpressive subsidiary, Active Power's needle would not move for investors.

As to motive, Plaintiffs allege Active Power had been promoting for years its intent to expand operations in China and Southeast Asia. These promises were largely unfulfilled going into 2013. Facing this mounting pressure, Plaintiffs allege Milner and Fife were desperate to latch onto a Chinese project which might salvage them in 2013, a year in which they announced they were focusing their efforts on China. A deal with Digital China provided such an outlet; a deal with Qiyuan did not. Therefore, they only told the public about Digital China because they knew telling the public about Qiyuan would provide them minimal traction with investors looking for signs of progress on Active Power's China front.

In sum, taking Plaintiffs' allegations as true and considering them collectively, the Court balances the competing inferences and ultimately concludes the alleged facts concerning Milner and Fife give rise to a strong inference of scienter sufficient to satisfy Rule 12 and the PSLRA. Plaintiffs' central allegations concerning Milner and Fife—their failure to disclose at any point Qiyuan as the true partner, their failure to identify Qiyuan as a subsidiary of Digital China, and their decision to broadcast Digital China as the new distributor—give rise to a strong inference these acts and omissions were "highly unreasonable" and "involve[d] not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and present a danger of

misleading . . . which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson*, 267 F.3d at 408.  In addition, Plaintiffs' allegations concerning motive create a strong inference Milner and Fife were under pressure to deliver immediate results in China, and this motive plausibly explains Milner and Fife's statements and omissions regarding the true nature of Active Power's new distributor agreement.

Therefore, the Court DENIES Defendants' motion to dismiss the claims against Milner and Fife for failure to allege scienter.

## IV.      The Class Period should begin February 19, 2013

In addition, and presumably in the alternative, Defendants argue the Class Period should not begin February 19, 2013, because the alleged false statements made by Milner in a conference call that day were forward-looking, did not even mention Digital China, and therefore cannot form the basis of a false statement for securities fraud purposes.  *Id.* at 17.  Plaintiffs disagree and contend Milner's statements were false concerning past, present, and future activity.

Although not explicitly mentioned by the Defendants, the Court presumes they are invoking the PSLRA's safe harbor provision concerning "forward-looking statements."  *See* 15 U.S.C. § 78u–5(c)(1)(A).  A "forward-looking statement," which can be either written or oral, includes "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer."  15 U.S.C. § 77z–2(i)(1)(B).

The statements at issue occurred on February 19, 2013, in an earnings conference call when Milner responded to a question from an analyst about Active Power's intended strategies in China and "other non-traditional geographies."  Am. Compl. [#26], ¶ 75.  Milner responded as follows:

> Sure our intent and we have been working for some time now really setting up an intelligent distribution system in China.  We will use a distribution partner, we intend

-20-

to use a distribution partner that will be our primary fulfillment channel for not just China but I would say Asia generally. And then that partner will work with our direct technical sales support people to develop opportunities and close them and they have been doing that for the past several months that in part is one of the reasons we have been successful finding or landing our first order for our new CSHD system in China. So it will be a distribution of fulfillment partner in China that we are having a network of resellers as resellers will be supported by our technical people on the ground. And I believe it's going to prove out to be a very efficient system.

*Id.*

While Milner's statements were, to some extent, "forward-looking" as he was discussing Active Power's intended plans and repeatedly uses "will" to describe future actions, he was also clearly describing past and present actions when he says: "we have been working for some time now really setting up an intelligent distribution system;" "they [i.e., the "distribution partner" and Active Power employees] have been [developing opportunities and closing them] for the past several months;" and this past cooperation partially explains why "we have been successful finding or landing our first order for our new CSHD system in China." Effectively, he was describing an already-established, ongoing partnership, which would develop going into the future. Therefore, the Court rejects Defendants' arguments these statements fall within the "forward-looking" safety harbor provision.

In addition, the Court concludes Plaintiffs adequately pleaded these statements were false. While Milner never explicitly identifies this new "distribution partner," as "Digital China," Plaintiffs argue Defendants were clearly referring to Digital China. Milner describes a "distribution partner that will be our primary fulfillment channel for not just China but . . . Asia generally," and then he says "that partner" has been working with Active Power employees to develop and close deals. Indeed, Milner states "that partner" has already been working with Active Power employees to close

-21-

Active Power's first CSHD system order in China.  Plaintiffs contend that suggesting the "partner" could be a primary fulfillment channel for not just China but Asia generally must be a reference to Digital China, a major company with a broad network.  According to Plaintiffs' allegations, creating the perception Active Power had an agreement with a partner capable of expanding Active Power's reach across Asia was false.  Milner knew this could not be true because Active Power's deal was with Qiyuan, a small company incapable of being Active Power's primary fulfillment channel for China and Asia generally.  Similarly, stating Active Power had already worked with such a partner to close a deal was also false.  Milner knew this could not be true because he knew the deal was with Qiyuan.

In other words, Plaintiffs allege Milner committed the same fraud with these statements he committed later on April 30, 2013, with the only difference being he omitted the name "Digital China." On April 30, 2013, Plaintiffs allege Milner perpetrated fraud when he misled the public into believing Active Power had a partnership agreement with a company capable of being Active Power's primary fulfillment channel for China and all of Asia by naming "Digital China" as the partner without ever mentioning the deal was actually with Qiyuan, a subsidiary of Digital China. On February 19, 2013, Plaintiffs allege Milner perpetrated fraud when he misled the public into thinking Active Power had a partnership agreement with an unnamed company capable of being Active Power's primary fulfillment channel for China and all of Asia without ever mentioning the partner was actually a subsidiary of this unnamed company.

The Court finds these allegations sufficient under the PSLRA and Rule 9, and declines Defendants' request to push the Class Period's start date from February 19, 2013, to April 30, 2013.

## V.       Plaintiffs' allegations support § 20(a) control-person claims

Finally, Defendants request the dismissal of the § 20(a) control-person claim on the ground

Plaintiffs have failed to establish an independent violation of the securities laws from which liability

under § 20(a) could flow.  *See* Defs.' Mot. Dismiss [#29], at 18.  Defendants' requested dismissal

of the § 20(a) claims are premised on the Court's dismissal of the § 10(b) and Rule 10b-5 claims for

lack of scienter.  As described above, the Court concludes Plaintiffs have adequately pleaded scienter

and denies Defendants' request to dismiss the § 10(b) and Rule 10b-5 claims.  Accordingly, the

Court also denies Defendants' dependent request to dismiss the § 20(a) claims.

### Conclusion

Plaintiffs' allegations in their Amended Complaint satisfy the heightened pleading standards

under the PSLRA and Rule 9.  Specifically, Plaintiffs adequately pleaded scienter both with respect

to the corporation, Active Power, and the individuals, Milner and Fife.

Accordingly,

IT IS ORDERED that Defendants Active Power, Inc., Stephen R. Fife, and Doug

Milner's Motion to Dismiss [#29] is DENIED.

SIGNED this the 2nd day of July 2014.

SAM SPARKS
UNITED STATES DISTRICT JUDGE